Good morning everyone. Lovely to have you here. First case of the day is 15-1059 United States v. Juwan Sturdivant. Good morning Mr. Alvarado. Good morning Your Honor. How are you? Very good. Oh, I know you'll keep your voice up for us. Okay. And you've got a huge audience today. Oh, that's all right. May it please the Court, Counsel. Your Honors, I would like to start with a discussion of the conflict in the testimony regarding whether there was a promise made by the police to take Mr. Sturdivant to see his mother. The government, in its brief, is asking the Court to remand this case to the District Court to make a finding as to what really happened. That is, if the Court needs that in order to resolve this appeal. We would join in that request unless the Court is going to accept Mrs. Thomas' testimony about what happened. But I think I really should explain that there is a serious conflict in the testimony between the police about how this came about. The lead detective, Detective Sandoval, testified on direct examination by the government that it didn't come up until after they found the firearm when they took him to the scene. And I believe her testimony was that they called for the crime scene technician to pick up the gun. And then, because Mr. Sturdivant was requesting to see his mother, they took him over to his mother's house. Now, on cross-examination, I had asked Detective Sandoval several times, didn't this come up during the interrogation session on the second day? And she never directly answered the question. But the best answer she gave was she didn't recall whether Mr. Sturdivant requested to see his mother during that interrogation. Now, Detective Moore, who was also present for that interrogation, said that that's not how it happened. He said that Mr. Sturdivant did ask to see his mother, and Detective Sandoval said, well, we have to get down to the business of these robberies. We need to find out about these robberies before we can talk about that. Now, both of the detectives said there were no promises made at that time, but a reasonable person in Mr. Sturdivant's shoes could reasonably conclude that unless he made statements, he wasn't going to get to see his mother. Mr. Alvarado? Yes. This is Judge Hamilton speaking. Mr. Sturdivant was in custody at that time, right? Yes, he was. He had no right to see his mother, did he? He did not. So why does this factual question matter? It matters because it is- He was on the first day. He was Mirandized. It wasn't recorded, but yes, he was given his Miranda Warnings. Those are the findings of the District Court, right? That every one of these interviews began with Miranda Warnings? Yes. So why does the factual dispute about whether or how or exactly when a gratuitous promise to let him talk to his mother would make a difference in undermining the confessions? Because it is one strong factor that goes into the question of whether his will was overborne when he did make the confessions. In fact, his mother was really a key thing for Mr. Sturdivant. On the first day when he was questioned, he brought up his mother during the conversation, got emotional, according to Detective Sandoval, and that's when he told the police that he wasn't feeling well and he needed his insulin. Then on the second day, he asked for his mother again, told the officers that he didn't spend a good night. But of course he- Forgive me, but I think it's somewhat noteworthy that he said nothing incriminating in that interview. We're talking about April 27th now, right? Right, on the first day. Right. Well, he said nothing incriminating on that first day. No, he didn't. In fact, the end of that first session, he started talking about himself in the third person. Jawan didn't do this, you didn't find Jawan's fingerprints on anything, that sort of thing. And I would submit that that is evidence that he was getting more confused, and that's why the detectives ended the interrogation that day. Do you think everybody that speaks of themselves in the third person is confused? Uh-oh. Be careful here. No, absolutely not. In fact, I didn't know it was called illeism until I read the government's brief on this, but it does- The detective thought it was different. I asked that question, she thought it was different, although she said that she had heard that in interrogations before when someone was trying to avoid responsibility for what they had done. But I would submit that under the circumstances here, his talking in the third person- Like Queen Victoria, we are not amused. Well, in any event, getting back to my point, his mother was a very crucial thing in his mind. Whenever he wasn't feeling well, whenever he needed insulin, whenever he really wanted advice or he didn't know what to do, his first thought was to ask for his mother. Yes, but that alleged promise, whether it be explicit or implicit, that the police would take him to see his mother if he cooperates, that is not so unusual or overpowering, it seems to me, as to prevent him from making a rational choice whether to cooperate. I think it is only one point in my argument, that you have to look at the totality of all the events that occurred to determine that there was coercion in this case and that it was not a voluntary confession. Well, isn't it somewhat noteworthy that neither he nor his mother said anything to the police about him needing insulin or any other form of medical attention even after he threw up? It is noteworthy, but at that point, a person in Mr. Sturtevant's shoes could reasonably believe that the police were not going to help him in that regard. They had never offered to let him check his blood sugar or bring his glucose meter. But can't the police rely on him to have asked for insulin? Well, he did ask for his insulin on the first day. He did not on the second day. Right. And as I noted, I think nothing incriminating happened on that first day. Does the record tell us whether he was being given insulin at other times while he was in police custody? The record is silent about whether he received any insulin when he was at the jail on the first night. When they brought him back to the police station on the second day at about 2 o'clock, the  You can't see, but you're into your rebuttal time, sir. OK. Your Honors, I will reserve my rebuttal time. OK. Thank you very much, Mr. Alvarado. And good morning, Ms. Boyle. Good morning, Your Honors. May it please the Court, my name is Catherine Boyle on behalf of the United States. Here, the district court correctly denied the defendant's motion to suppress because his confession was voluntary. He did not show that the confession was coerced under the totality of circumstances. First of all, there's no evidence here that his free will or rational intellect were overcome by any of the factors mentioned by the defense. Well, presumably, the jail had some protocol for dealing with diabetic inmates. Wouldn't it be helpful to know what that protocol was and whether he was given insulin before or after the various interviews, for example? It would, Your Honor. We just don't have anything in the record on that point. Regarding his diabetes and whether he was given insulin, we would note that on April 27th, when the defendant asked for insulin, he was immediately offered insulin and the services of a medic. He declined the offer of insulin in favor of taking a smoking break. He did not ask to check his blood sugar at any time. And I would also note that the detectives brought his insulin to the police station and left it outside the interrogation room. The defendant's mother was also told that she could bring any additional medication, which presumably would include the glucose meter, to the jail for her son. Did she respond to that or just not bring it? Pardon? Did she respond to the offer to let her bring it? Or did she just show up at the jail without it? The record is silent on that point, Your Honor. We don't know whether she brought anything. But she was offered the chance to bring the medicine? I believe Detective Moore told her. And that is in the record? Yes. Well, the detective testified. Pardon? The detective testified to that. Oh. Well, that's in the record, right? Yes. Yes, Your Honor. I'm not sure what she's most deprived of, his mother's presence or the insulin. But to an Irish girl, that wouldn't be a shock, would it? Yes, Your Honor. We also think that the defendant never indicated on the afternoon of April 28th that he never asked for insulin. He never indicated he was in distress. During all of these three interviews, the detective said they never saw signs that he was suffering from the effects of diabetes. Additionally... Of course, the subsequent need for hospitalization... Yes. ...certainly suggests the possibility that he may not have been getting the insulin that he needed when the interviews took place. In other words, I mean, even if he didn't overtly show signs of diabetic distress during the videotaped interview, should there have been further inquiry into whether and when his blood level, his blood sugar level, was checked while he was in custody and whether or not he was given insulin? Well, Your Honor, he was offered insulin on the evening of April 27th. Additionally... But we're zeroing in on the evening of the 28th. Yes. I believe for the videotaped interview, the detective confirmed that he had diabetes, asked him how he was doing. He indicated he was all right. He indicated he understood everything that was going on and that he was in the right frame of mind. That was a clear opportunity if he needed insulin for him to indicate that. He had been diagnosed with diabetes at the age of 14, so he presumably knew his own symptoms at that point in time. Additionally, the hospital event occurred three days after the April 28th interview, so we don't know how his blood sugar was or was not controlled in the intervening three-day period. Your Honor, I'd like to briefly address the other points in the defendant's brief regarding the police's allegation of DNA evidence and the alleged promise that the defense discussed. The alleged what? The alleged promise. Oh, promise. Yes. I'll go to that first. First of all, as my opposing counsel noted, we don't believe that there was a promise. However, we believe even if there were a promise to the defendant to take him to see his mother following his cooperation, we don't think that that indicates that the confession was involuntary in any way. So can I just make sure I've got the facts straight on this? Yes, Your Honor. The two detectives testified no such promise was made. The two detectives did testify that no such promise was made, Your Honor. And the mother testified that one of the detectives had said what? The mother testified that one of the detectives called her and said that if her son cooperated, they would be able to bring him by to see her. Is there any indication, any evidence in the record that that phone call, that alleged promise in the phone call was relayed to the defendant, Mr. Sturdivant? There, I did not see any evidence in the record indicating that the phone call was relayed to the defendant. There is an allegation that the defendant brought up the idea that he wanted to see his mother during interrogation, and the police said that they would have to get to the bottom of the robberies first, Your Honor. But that is, the detective who explained that said he didn't think it was a promise. Okay. So regarding the promise, we would just first of all point out that this was something that was brought up by the defendant and negotiated by the defendant. Previous cases have stated that police are able to promise things such as a reduction in charges. They're able to condition liberty on cooperation. This is clearly something much more minor. Here, the police are merely, if there were a promise, which again we dispute, the police are merely saying, maybe we'll take you to see your mother. They weren't conditioning a reduction in his charges or anything as great as that. Additionally, the government fulfilled its promise to the extent there was one, which again we dispute. And the defendant didn't implicate his accomplice, whom he later described as like a little brother to him, indicating that at this point he was capable of rational thought, he was capable of making decisions, and he was negotiating for this alleged promise. If your honors have no further questions, I'll return the balance of my time. Thank you. Thank you. Okay, Mr. Alvarado. Your honors, regarding the last point that the government made regarding the fact that Mr. Sturdivant did not implicate his partner or another person in this offense, they're claiming that that shows that he was rational, he's in control of himself. I would submit it's just as reasonable to infer that he didn't implicate anybody else because he didn't want to falsely implicate anybody else. He had been told on the night of the first interrogation all the details of the offenses, including the fact that there were supposedly two gunmen that were masked and that a shot had been fired in all four robberies. That's the only point I wanted to make, and I do want to thank the court for letting me appear by phone. Well, you came through loud and clear, and we were happy to accommodate you. And the case will be taken under advisement, and we thank you very much.